**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MINORITY TELEVISION PROJECT, INC., | No. 09-17311 |
| *Plaintiff-Appellant*, | |
| | D.C. No. 3:06-cv-02699-EDL |
| v. | |
| FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA, | OPINION |
| *Defendants-Appellees*, | |
| and | |
| LINCOLN BROADCASTING COMPANY, *Intervenor*. | |

Appeal from the United States District Court
for the Northern District of California
Elizabeth D. Laporte, Magistrate Judge, Presiding

Argued and Submitted En Banc
March 19, 2013—San Francisco, California

Filed December 2, 2013

Before: Alex Kozinski, Chief Judge, and John T. Noonan,
Barry G. Silverman, M. Margaret McKeown, Kim McLane
Wardlaw, William A. Fletcher, Ronald M. Gould, Marsha
S. Berzon, Johnnie B. Rawlinson, Consuelo M. Callahan
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Callahan;
Dissent by Chief Judge Kozinski

## SUMMARY[*]

### Public Television

The en banc court affirmed the district court's summary judgment in favor of the government in an action brought by a public television broadcaster challenging, on First Amendment grounds, 47 U.S.C. § 399b, which prohibits public radio and television stations from transmitting paid advertisements for for-profit entities, issues of public importance or interest, and political candidates.

Applying intermediate scrutiny, the court upheld the advertising ban as constitutional. The panel concluded that substantial evidence before Congress supported the conclusion that the advertising prohibited by § 399b posed a threat to the noncommercial, educational nature of noncommercial educational programming and that additional evidence bore out Congress's predictive judgment in enacting § 399b. The court held that the government has a substantial interest in imposing advertising restrictions in order to preserve the essence of public broadcast programming. The court further held that § 399b's restrictions were narrowly tailored to the harms Congress sought to prevent and that the

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

restrictions left untouched speech that did not undermine the goals of the statute.

The court rejected the assertion that the § 399b was overinclusive because it prohibited political and issue advertising and underlinclusive because it permitted advertising by non-profit entities. Finally, the court affirmed the district court's dismissal of the as-applied challenges to § 399b and its challenge to the related regulation, 47 C.F.R. § 73.621(e), on the grounds that jurisdiction over challenges to Federal Communication Commission orders lies exclusively in the court of appeals; as such, federal district courts lack jurisdiction over appeals of such orders.

Concurring and dissenting, Judge Callahan stated that she concurred in the majority's opinion only insofar as it upholds 47 U.S.C. § 339(b)'s prohibition against paid advertisements by for-profit entities. She dissented from the majority's acceptance of § 339(b)'s prohibition of advertisements on issues of public importance or interest and for political candidates.

Dissenting, Chief Judge Kozinski, with whom Judge Noonan joined, stated that would strike down as unconstitutional the statute and corresponding regulations that prohibit public broadcast stations from carrying commercial, political or issue advertisements. Chief Judge Kozinski stated that the evidence presented by the government in support of these speech restrictions doesn't pass muster under any kind of serious scrutiny, and that even if intermediate scrutiny applies there is simply not enough there to satisfy a skeptical mind that the reasons advanced are rational, let alone substantial.

**COUNSEL**

Walter Elmer Diercks (argued), Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, D.C.; John L. Fitzgerald, Pinnacle Law Group, San Francisco, California, for Plaintiff-Appellant.

Mark B. Stern (argued) and Samantha L. Chaifetz, Attorneys, Appellate Staff, United States Department of Justice, Civil Division, Washington, D.C.; Joseph P. Russoniello, United States Attorney; Tony West, Assistant Attorney General; Austin C. Schlick, General Counsel, Jacob M. Lewis, Acting Deputy General Counsel, Joel Marcus, Attorney, and Maureen K. Flood, Attorney, Federal Communications Commission, Washington, D.C., for Defendants-Appellees.

Joyce Slocum and Gregory Allan Lewis, National Public Radio, Inc., Washington, D.C.; Katherine Lauderdale and Thomas Rosen, Public Broadcasting Service, Arlington, Virginia, for Amici Curiae National Public Radio, Inc., and Public Broadcasting Service.

**OPINION**

McKEOWN, Circuit Judge:

Public television—a fixture of American life for decades—has showcased Masterpiece Theater, PBS NewsHour, children's programs such as Sesame Street and Curious George, and many more audience favorites. The hallmark of public broadcasting has been a long-standing restriction on paid advertising to minimize commercialization. In a classic case of "follow the money,"

Congress recognized that advertising would change the character of public broadcast programming and undermine the intended distinction between commercial and noncommercial broadcasting.

Public broadcast radio and television stations are regulated by federal statute. Under 47 U.S.C. § 399b, public stations are prohibited from transmitting paid advertisements for for-profit entities, issues of public importance or interest, and political candidates. These restrictions were adopted to minimize commercialization of public broadcast stations, also known as noncommercial educational ("NCE") stations because they are "used primarily to serve the educational needs of the community; for the advancement of educational programs; and to furnish a nonprofit and noncommercial television broadcast service." 47 C.F.R. § 73.621.

Minority Television Project ("Minority TV"), a public television broadcaster, challenges the advertising restrictions as facially unconstitutional under the First Amendment. Applying intermediate scrutiny, as counseled by the Supreme Court in *FCC v. League of Women Voters*, 468 U.S. 364 (1984), we uphold the advertising ban as constitutional. We also affirm the district court's dismissal of Minority TV's as-applied challenges to § 399b and its challenge to the related regulation, 47 C.F.R. § 73.621(e).

### BACKGROUND

## I.  NONCOMMERCIAL EDUCATIONAL STATIONS

For three-quarters of a century, the Federal Communications Commission ("FCC") has set aside broadcasting channels for noncommercial educational

stations. *See* 3 Fed. Reg. 364 (Feb. 9, 1938) (reserving channels for NCE FM radio stations); *Sixth Report & Order*, 41 F.C.C. 148, 158–59 (1952) (reserving channels for NCE television stations); *see also* 47 U.S.C. § 303 (a)–(b) (authorizing the FCC to classify radio stations and "[p]rescribe the nature of the service to be rendered by each class of licensed stations"). The FCC explained that it was reserving a portion of the broadcast spectrum for NCE television stations because of "the important contributions which noncommercial educational television stations can make in educating the people both in school—at all levels—and also the adult public," and the "high quality type of programming" available on NCE stations—"programming of an entirely different character from that available on most commercial stations." *Third Notice of Further Proposed Rulemaking*, 16 Fed. Reg. 3072, 3079 (1951).

From the start, the FCC recognized that allowing NCE stations to "operate in substantially the same manner as commercial applicants" would not further its goal of ensuring high quality educational programming. 41 F.C.C. at 166 (1952). Initially, NCE stations were prohibited from airing any promotional content—even if it was unpaid—and were only permitted to identify program underwriters by name. *See* 17 Fed. Reg. 4062 (1952); *Commission Policy Concerning the Noncommercial Nature of Educational Broadcast Stations*, 86 F.C.C. 2d 141, 142, 154 (1981).

In response to concerns that this restriction was broader than necessary to achieve its purpose, the FCC embarked on an extensive notice and comment proceeding between 1978 and 1981. *See* 86 F.C.C. 2d at 141; *Commission Policy Concerning the Noncommercial Nature of Educational Broadcast Stations*, 90 F.C.C. 2d 895, 909 (1982). The FCC

undertook this effort "with an eye toward striking a reasonable balance between the financial needs of such stations and their obligation to provide an essentially noncommercial broadcast service." 86 F.C.C. 2d at 141. In crafting new rules, the FCC noted that its "interest in creating a 'noncommercial' service has been to remove the programming decisions of public broadcasters from the normal kinds of commercial market pressures under which broadcasters in the unreserved spectrum usually operate." *Id.* at 142. Cognizant of First Amendment concerns, the FCC stated that it was adopting "the minimum regulatory structure that preserves a reasonable distinction between commercial and noncommercial broadcasting." *Id.* at 144. At the end of lengthy deliberation, the FCC in 1981 set out a new, liberalized broadcast advertising framework. *Id.* Later that year, after two days of hearings,[1] Congress essentially codified the FCC's new framework in 47 U.S.C. §§ 399a and 399b.[2]

---

[1] *Hearings before the Subcomm. on Telecomms, Consumer Protection, and Finance of the H. Comm. on Energy and Commerce on H.R. 3238 and H.R. 2774*, 97th Cong. (1981) (hereinafter "H. Hgs."). H.R. 3238 ("The Public Broadcasting Amendments Act of 1981") was passed by the House, but § 399a and § 399b, along with the rest of the Public Broadcasting Amendments Act of 1981, were enacted as part of the Omnibus Budget Reconciliation Act of 1981. Pub. L. No. 97-35, 95 Stat. 357 (1981). We look to the legislative history of H.R. 3238 for the record before Congress when it enacted § 399b.

[2] There were two minor differences between the FCC's framework and the enacted statutes. The FCC prohibited all goods and services advertising for which consideration was received, but § 399b prohibits such advertising by for-profit entities only. Section 399a also differs somewhat from the FCC's treatment of donor acknowledgments. 90 F.C.C. 2d at 901–02.

Section 399b—the heart of this case—prohibits paid advertising, except for advertising for goods and services offered by non-profit organizations. An "advertisement" is defined as material transmitted in exchange for remuneration that is intended:

> (1) to promote any service, facility, or product offered by any person who is engaged in such offering for profit;
>
> (2) to express the views of any person with respect to any matter of public importance or interest; or
>
> (3) to support or oppose any candidate for political office.

§ 399b(a). Section 399b allows the airing of promotional content for which consideration is not received. Section 399a, which is not at issue here, permits the use of non-promotional identifying information in donor acknowledgments (for example, logograms and location information). This scheme has been the law for more than 30 years.

## II. MINORITY TV PROCEEDINGS

Minority TV is the licensee of a noncommercial educational television station in San Francisco subject to the advertising restrictions in 47 U.S.C. § 399b and 47 C.F.R. § 73.621(e). After another broadcaster complained to the FCC about Minority TV's underwriting announcements, the FCC commenced a proceeding against Minority TV. The FCC's Enforcement Bureau found that Minority TV had

broadcast announcements that violated § 399b and § 73.621(e) more than 1,911 times, and issued a Notice of Apparent Liability for Forfeiture in the amount of $10,000. 17 FCC Rcd. 15646 ¶¶ 30, 33 (2002). Minority TV's announcements were in exchange for consideration and on behalf of for-profit corporations such as Chevrolet, Ford, and Korean Airlines. *Id.* ¶ 14. The FCC found that the advertisements included improper promotional language. *Id.* ¶¶ 9, 15. The FCC rejected nearly all of Minority TV's challenges and issued a forfeiture order for $10,000. 18 FCC Rcd. 26611 (2003). The FCC denied Minority TV's application for review and petition for reconsideration. 20 FCC Rcd. 16923 (2005); 19 FCC Rcd. 25116 (2004).

Minority TV then filed in this court a petition for review of the FCC orders. After filing the petition, Minority TV paid the $10,000 forfeiture to the FCC in full. We transferred the case to district court.**[3]**

The district court dismissed Minority TV's challenges to the notice and the forfeiture order, its as-applied challenges to § 399b, and its facial and as-applied challenges to § 73.621(e) for lack of jurisdiction because the courts of appeals have exclusive jurisdiction to review FCC regulations and orders. 47 U.S.C. § 402(a). The court explained that § 504(a), the carve-out allowing district courts to review forfeiture orders, applied only to unpaid forfeiture actions. 47 U.S.C. § 504(a).

---

**[3]** In transferring the case, we cited 47 U.S.C. § 504(a) and *Dougan v. FCC*, 21 F.3d 1488, 1490–91 (9th Cir. 1994), in which we held that "§ 504(a) vests exclusive jurisdiction in the district courts to hear enforcement suits by the government *and* suits by private individuals seeking to avoid enforcement." *Id.* (emphasis added).

On cross-motions for summary judgment, the district court granted summary judgment for the FCC on Minority TV's facial challenges to § 399b. *Minority Television Project, Inc. v. FCC*, 649 F. Supp. 2d 1025, 1048 (N.D. Cal. 2009). Invoking the intermediate scrutiny test from *League of Women Voters*, the court held that the statute was "narrowly tailored to further a substantial government interest." *Id.* at 1042. The court pointed to the ample evidence before Congress showing that "the advertising prohibitions were necessary to preserve the unique programming presented by public stations," *id.* at 1037, and to "additional material before the Court demonstrat[ing] that the legislative conclusions are supported by substantial evidence," *id.* at 1039. In addition, the court held that the statute was not unconstitutionally vague. *Id.* at 1048.

Minority TV appealed. The panel upheld the ban on for-profit goods and services advertising. Two members of the divided panel issued separate opinions striking down the statute's ban on issue and political advertising. *Minority Television Project, Inc. v. FCC*, 676 F.3d 869 (9th Cir. 2012). In dissent, Judge Paez determined that §§ 399b(a)(2) and (3) were neither "patently overinclusive [nor] underinclusive," and that there were no "'less restrictive means' to § 399b that [were] readily available.'" *Id.* at 893–95 (Paez, J., dissenting) (citation omitted). Unlike the panel majority, Judge Paez found substantial record evidence to support § 399b's narrow tailoring. *Id.* at 896–97. In an unpublished memorandum disposition, the panel unanimously held that the district court correctly dismissed Minority TV's as-applied challenges to § 399b and its challenges to 47 C.F.R. § 73.621(e), and that § 399b was not unconstitutionally vague.[4] A majority of

---

[4] Minority TV did not appeal the district court's dismissal of its claims regarding the notice and the forfeiture order.

nonrecused active judges voted in favor of rehearing en banc. 704 F.3d 1009 (9th Cir. 2012).

## ANALYSIS

## I. FACIAL INTERMEDIATE SCRUTINY CHALLENGE TO § 399b

### A. FRAMEWORK FOR ANALYSIS

#### 1. Intermediate Scrutiny Test for Broadcast Regulation

The Supreme Court laid down the standard for evaluating the constitutionality of § 399b—intermediate scrutiny—in *League of Women Voters*. 468 U.S. at 380. That case involved a First Amendment challenge to a statutory provision forbidding all NCE stations that received grants from the Corporation for Public Broadcasting from "engag[ing] in editorializing." *Id.* at 366 (citing 47 U.S.C. § 399 (1980)). The Court declined to apply strict scrutiny even though the statute was content-based and "plainly operate[d] to restrict the expression of editorial opinion on matters of public importance"—a form of speech "entitled to the most exacting degree of First Amendment protection." *Id.* at 375–76. It explained that, "because broadcast regulation involves unique considerations, our cases have not followed precisely the same approach that we have applied to other media and have never gone so far as to demand that such regulations serve 'compelling' governmental interests." *Id.* at 376.

The Court struck down the ban on editorialization because it was not "sufficiently tailored to the harms it s[ought] to

prevent to justify its substantial interference with broadcasters' speech." *Id.* at 392. In particular, the ban was "manifest[ly] imprecis[e]"—both "patent[ly] overinclusive[] and underinclusive[]." *Id.* at 392, 396. The government's substantial interest in ensuring that viewers did not think broadcasters' editorials reflected the views of the government could "be fully satisfied by less restrictive means that [were] readily available." *Id.* at 395.

Like the statute at issue in *League of Women Voters*, § 399b is a content-based broadcast regulation, and we may uphold the statute's restrictions on advertising only if we are satisfied that they are "narrowly tailored to further a substantial governmental interest." *Id.* at 380. In addition, because subsections (a)(2) and (a)(3) burden public issue and political speech, we must be "particularly wary in assessing [the statute] to determine whether it reflects an impermissible attempt 'to allow a government [to] control . . . the search for political truth.'" *Id.* at 384 (quoting *Consolidated Edison Co. v. Public Service Comm'n of N.Y.*, 447 U.S. 530, 538 (1980) (alteration in original)).

Minority TV urges us to adopt a strict scrutiny standard. We do not credit Minority TV's argument that *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010), overruled decades of precedent sub silentio—especially given that the Court there expressly overruled two other cases with no mention of *League of Women Voters* or an intent to change the level of scrutiny for broadcasting. *Citizens United* was not about broadcast regulation; it was about the validity of a statute banning political speech by corporations. Had *Citizens United* changed the standard for broadcast regulation, presumably the Supreme Court would have recognized as much two years later in *FCC v. Fox Television*

*Stations*, 132 S. Ct. 2307, 2320 (2012), rather than declining to address the broadcasters' claim that precedent providing for less rigorous scrutiny of broadcast regulation "should be overruled because the rationale of that case has been overtaken by technological change." The Supreme Court has not gone there and neither should we, absent a complete record on the subject and a change of direction by the Supreme Court. This case is not a suitable one for such fundamental reconsideration of longstanding precedent.[5]

### 2.   Scope of the Record

We are presented with an ample record to support § 399b, consisting both of evidence that was before Congress in 1981 and evidence before the district court that covered the period after enactment. Following the Supreme Court's lead, we look to "the evidence before Congress and then the further evidence presented to the District Court." *Turner Broadcasting Sys. v. FCC*, 520 U.S. 180, 196 (1996) (*"Turner II"*). As a matter of course, in multiple First Amendment cases, the Court has looked beyond the record before Congress at the time of enactment. *See, e.g.*, *League of Women Voters*, 468 U.S. at 387 & n.18, 390 & n.19, 392 n.21, 393 n.22 (looking to testimony before Congress as well as reports and other evidence following the statute's enactment), and *United States v. Playboy Ent. Grp.*, 529 U.S.

---

[5] We acknowledge that there has been considerable technological change in broadcasting, including the ubiquity of the Internet. However, a thoughtful examination of the impact of those changes on the use of broadcast spectrum, market segmentation, and the like can hardly occur on a record bare of evidence of the impact of technological change. Minority TV has offered nothing other than sound bite platitudes, and the dissent has offered nothing other than a series of newspaper articles, with the weight of such publications as ESPN Playbook and Variety.

803, 821–22 (2000) (faulting the government for failing to produce additional "probative evidence" to supplement the "near barren legislative record" in applying strict scrutiny).

Congress enacted §§ 399a and 399b after a two-year FCC notice and comment proceeding, days of hearings, and a thoughtful committee report. Indeed, the record before Congress provides a sufficient basis to uphold the statute even without the supplemental evidence offered in the district court. This case "does not present a close call" requiring us to elaborate on what evidentiary burden Congress bears in enacting a law that implicates First Amendment rights. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 393 (2000); *see also Sable Comm. of Cal., Inc. v. FCC*, 492 U.S. 115, 133 (1989) (Scalia, J., concurring) ("Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote.").

It is clear, however, that Congress is "not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 666 (1994) ("*Turner I*"). We reject Minority TV's suggestions to the contrary. The dissent's insistence on "evidence" in the technical sense is misplaced. We are not abdicating to a congressional whim or succumbing to some notion that "judges like public radio and television," Dissent at 41, simply because we give credence to congressional findings. Pure and simple, the dissent doesn't like what Congress found after considering extensive FCC administrative proceedings, holding its own hearings, and preparing a committee report. Congress is a political body that operates through hearings, findings, and legislation; it is

not a court of law bound by federal rules of evidence. Ignoring fundamental principles of separation of powers, the dissent would rewrite the legislation, ignore the congressional evidence, and substitute pop culture and its own policy judgment for that of Congress.

In enacting §§ 399a and 399b, Congress made a prediction about the effects of underwriting announcements, logograms, and advertising on public broadcast programming. We must accord deference "to [Congress's] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." *Turner II*, 520 U.S. at 196. Congressional concern and prognostication was well informed, but the information before Congress was necessarily limited because advertising had never been allowed on NCE stations. The First Amendment does not require Congress to wait for a feared harm to take place before it can act. Such a high bar would make little practical sense—it would tie Congress in knots and strip it of its ability to adopt forward thinking public policy. "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner I*, 512 U.S. at 665.

Apart from the evidence that was before Congress in 1981, the government presented significant additional evidence, including a 2007 report by the Government Accountability Office ("GAO") on public television; the report of the Temporary Commission on Alternative Financing for Public Telecommunications, which oversaw an

experiment with limited advertising on public television; information about political advertising; an expert report from a Stanford University professor emeritus with over 40 years of experience in studying the economics of broadcasting and public television; and a declaration from a vice president of a foundation that operates numerous noncommercial educational radio and television stations.

We conclude that substantial evidence before Congress supported the conclusion that the advertising prohibited by § 399b posed a threat to the noncommercial, educational nature of NCE programming and that the additional evidence bears out Congress's predictive judgment in enacting § 399b. Minority TV's scant evidentiary showing reinforces this conclusion. *See Nixon*, 528 U.S. at 394 (noting that more extensive evidence might be required if the parties challenging the statute "had made any showing of their own to cast doubt" on the evidence supporting it). Similarly, the dissent offers only speculation not substance for its view that permitting unfettered advertising wouldn't lead to distortion and perverse incentives. Poking holes in the congressional evidence is hardly a substitute for the scrutiny required of this court.

## B. INTERMEDIATE SCRUTINY ANALYSIS OF SECTION 399b

We now turn to a more detailed analysis of whether § 399b is "narrowly tailored to further a substantial governmental interest." *League of Women Voters*, 468 U.S. at 380. Section 399b was enacted in 1981 against the backdrop of declining federal support for public broadcasting. Congress was acutely aware that public broadcasting needed new sources of revenue to survive, but it was also worried

about undermining the essential nature of public broadcast programming. The FCC had just promulgated new, liberalized regulations that were "designed to further the important governmental interest in preserving the essentially noncommercial nature of public broadcasting *within a minimal regulatory framework* by insulating public broadcasters from commercial marketplace pressures and decisions." 90 F.C.C. 2d 895, 896 (1982) (statement by FCC Commissioner Washburn clarifying the impact of the Public Broadcasting Amendments Act on the recently issued regulations) (emphasis in original). The FCC believed the liberalized advertising restrictions "satisf[ied] constitutional objections." *Id.* Congress agreed, and so do we.

### 1.  Substantial Governmental Interest

Federal regulation of the broadcast spectrum, a scarce public resource, is entitled to more deferential First Amendment review than regulation of other types of media. *See Reno v. ACLU*, 521 U.S. 844, 868 (1997) (highlighting the "special justifications for regulation of the broadcast media that are not applicable to other speakers," including the "history of extensive Government regulation of the broadcast medium," "the scarcity of available frequencies at its inception," and "its 'invasive' nature") (citations omitted); *Turner I*, 512 U.S. at 637 (noting that the "justification for [the Court's] distinct approach to broadcast regulation rests on the unique physical limitations of the broadcast medium"). This deferential review is not strict scrutiny light, but instead requires us to benchmark the statute against the requirements of *League of Women Voters*, including the government's substantial interest. Section 399b's advertising restrictions speak directly to the government's substantial interest in maintaining the unique, free programming niche filled by

public television and radio. That Minority TV does not contest the government's substantial interest in ensuring the diversity and quality of public broadcast programming is no surprise. Nonetheless, it is useful to detail the nature and scope of the government's interest both as a prelude to and a basis for informing our narrow tailoring analysis.

The First Amendment rights of Minority TV and potential advertisers do not exist in a vacuum. The Supreme Court has recognized the public's right "to receive suitable access [through broadcast media] to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). "Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of great delicacy and difficulty," and "we must afford great weight to the decisions of Congress and the experience of the [FCC]." *Columbia Broad. Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973).

In pursuit of its goal, the government set aside specific channels for noncommercial use, provided funding through the Corporation for Public Broadcasting and other means, and created special requirements and restrictions for NCE stations. *See, e.g.*, 47 U.S.C. §§ 303 (a)–(b), 394, 396, 399a, 399b; 47 C.F.R. § 73.503. However, the dissent fails to appreciate that section 399(b) is a central prong of these structural constraints and that they operate as a package to effectuate congressional intent. The dissent's selective excision of a foundational principle of public television undermines the integrated legislative package and ignores the FCC's experience with public television. Section 399b does not stand alone; it is an important piece of a comprehensive

scheme to promote programming that is differentiated from the typical commercial fare.

Numerous statutes and reports recognize the unique nature of NCE programming. For example, when the FCC first set aside television channels for noncommercial use, it pointed to "the important contributions which noncommercial educational television stations can make" and the "high quality type of programming" available on NCE stations—"programming of an entirely different character from that available on most commercial stations." *Third Notice of Further Proposed Rulemaking*, 16 Fed. Reg. 3072, 3079 (1951). In the Public Broadcasting Act of 1967, which, among other things, established the Corporation for Public Broadcasting, Congress found that "[i]t furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, which will constitute an expression of diversity and excellence, and which will constitute a source of alternative telecommunications services for all the citizens of the Nation." 47 U.S.C. § 396(a)(5). And in passing the Children's Television Act of 1990, the Senate explained that "public television is the primary source of educational children's programming in the United States."[6] S. Rep. 101-66, at 7 (1989).

---

[6] Speaking before the Senate on this Act, Senator Wirth stated that "[t]he marketplace has simply failed to produce [educational children's programming] on its own, in large part because the advertiser-driven television industry does not find children's programming to be a particularly lucrative venture" and that "educational [children's] programs have literally disappeared from the airwaves on all but PBS stations." 136 Cong. Rec. 18241–18242 (daily ed. July 19, 1990).

The unrebutted evidence before us documents that programming on public broadcast stations is markedly different from that on commercial stations. That was true in 1981 when Congress enacted § 399b, and it is true now. As the district court noted, "Congress did not write on a blank slate when it enacted Section 399b; rather, after a half-century of experience with public broadcasting, the record before Congress showed that public television and radio stations carry very different programming than do commercial stations." 649 F. Supp. 2d at 1036. For example, there was testimony before Congress that public radio allows "7 or 15 minutes to explore an issue, rather than being confined to the 30-60- and 90-second snatches common to commercial stations," provides "the only network for the blind," "gives you jazz live," and provides four hours of daily news of a different nature than that provided by commercial stations. H. Hgs. at 323 (Walda W. Roseman, Senior Vice President, National Public Radio ("NPR")).

Stanford University Professor Emeritus Roger Noll, a government expert who has spent over forty years studying the economics of broadcasting and public television, presented evidence that "non-commercial stations offer statistically significantly more public affairs, children's and family programming, and statistically significantly less violent programming, than both affiliates of commercial networks and all other commercial stations." According to the Government Accountability Office, public broadcasters devote 16 percent of all program hours to educational children's programming,[7] compared to the 3.32 hours per week the average commercial broadcaster gives to such

---

[7] Some NCE stations devote more than 40 percent of their weekday program hours to children's programming.

programming.    Many NCE stations also broadcast instructional programming for adults, including GED preparation, community college telecourses, and professional growth programming for teachers and administrators.    In addition, some public broadcast stations are the only source of local programming that is not related to news or sports.

The primary harm § 399b sought to prevent was the loss of the distinctive content of public broadcast programming. Congress heard from dozens of witnesses who testified, among other things, that "[c]ommercialization will make public television indistinguishable from the new commercial or pay culture cable services," H. Hgs. at 149 (Larry Sapadin, Executive Director, Association of Independent Video & Filmmakers, Inc.), and that NCE-type programming "is just not possible with the commercial constraints of providing a commercial service," H. Hgs. at 323 (Walda W. Roseman, NPR).    "All consumer and public interest group representatives" who testified "were concerned about what they viewed as a trend towards the commercialism of public broadcasting."  H. R. Rep. No. 97-82, at 9 (1981).

One of the major themes in the evidence before Congress was that advertising distorts programming decisions because advertisers have something to sell—be it a product, message, or candidate—and they want to sell it to the largest audience possible.  Representative Robert Matsui, a former member of the Communications Subcommittee, explained that the "principal thrust of commercial broadcasting . . . is controlled by its need to reach mass audiences in order to sell products. While this mass approach is definitely a valid purpose, commercial broadcasting is unable thereby to respond to the myriad of individual needs of any community. . . .   It simply does not possess the programming flexibility to tailor shows

to serve the numerous characteristics of each community."
H. Hgs 30–31. Similarly, an article submitted to the House
by the National Association of Educational Broadcasters
explained that public broadcasters "don't aim to amuse the
lowest common denominator of the audience because we're
not seeking the highest ratings possible. Because we don't
carry ads. Because the law won't let us." H. Hgs. 226–27;
*see also* H. Hgs. 129-30 (John C. DeWitt, American Found.
for the Blind) (testifying that "commercialization of public
broadcasting . . . run[s] the danger that [broadcasters] will
focus on the lowest common denominator of programming"
rather than on serving "diverse audiences" like minorities,
women, and the print handicapped). One member of the
House of Representatives summed up this concern: "Will the
search for dollars compromise [public broadcasting's]
creative genius? Will there be strings attached to the money
that is given to public broadcasting so that the most
courageous and needed programs are not funded for fear of
controversy—or simply fear itself?" 127 Cong. Rec. 13148
(June 22, 1981) (Rep. Waxman).

The commercialization Congress feared was not restricted
to typical commercial business advertising. Rather, Congress
was worried about the commercialization of public
broadcasting itself: the selling of airtime. *See, e.g.*, H. Hgs.
71 (Senator Wirth describing how the "selling of time" would
transform public broadcasting by leading stations to make
programming decisions based on their calculations of the
advertising value of shows); *see also* H. Hgs. 149 (the
Executive Director of the Association of Independent Video
& Filmmakers, Inc., emphasizing that "[s]elling makes its
own demands").

Congress heard testimony about the need to protect public broadcasting from all special interests whose advertising dollars could affect programming decisions. *See* H. Hgs. 112 (Jack Golodner, Director, Department for Professional Employees, AFL-CIO) ("[I]f public broadcasting is to perform its role . . . , then sufficient public funding must be made available so that to the furthest extent humanly possible, it is insulated from political, corporate, and, for that matter, labor influence."). The record shows that Congress was concerned with "insulat[ing] public broadcasting from special interest influences—political, commercial, or any other kind." 127 Cong. Rec. 13145 (1981) (Rep. Gonzales); *see also* H.R. Rep. No. 97-82, at 16 (1981) (listing as a criterion for alternative financing mechanisms the "insulation of program control and content from the influence of special interests—be they commercial, political or religious").

Evidence before the district court reinforces the congressional view that if advertising were allowed, programming would "follow the money," changing the nature of public broadcast programming. The research cited by Noll is consistent with much of the testimony before Congress, and it bears out Congress's predictive judgment that advertising would change the face of public broadcasting. Noll explained that commercial broadcasting suffers from a "market failure" in that a "competitive, advertiser-supported television system leads to an emphasis on mass entertainment programming with insufficient attention to programs that serve a small audience, even if that audience has an intense desire to watch programs that differ from standard mass entertainment programs." According to Noll, in order to attract advertising dollars, NCE stations would have to change their programming to be more like that on commercial stations—programming that advertisers prefer because it attracts large audiences.

The diversity and quality of programming on public broadcast stations stems both from the restrictions on advertising and from the incentives created by the existing funding structure. Funding for NCE stations comes from federal, state, and local subsidies; donations from viewers; and program underwriters including corporations, foundations, and other entities. Noll explained that, "[b]ecause the viability of public television stations depends on attracting donations, stations are motivated to offer programs that encourage voluntary contributions from the communities that they serve."

Lance Ozier, the Vice-President for Planning and Policy of the WGBH Educational Foundation, detailed that funding from federal and state government sources as well as foundations and other not-for-profit underwriters would be jeopardized if NCE stations were permitted to air paid advertisements. Ozier stated that the loss of funding would not be restricted to those stations who chose to air advertisements: "Every public station would face the consequences generally of a perceived deviation from the public education mission."

In 2007, the GAO reported that many of the public television licensees with whom it spoke opposed greater underwriting flexibility. The large majority that opposed greater underwriting flexibility said that it "would not generate increased underwriting revenues, since corporations and advertisers desire programming with high ratings and a targeted demographic," "would upset viewers and contribute to a decline in membership support," "could threaten a licensee's ability to receive financial support from a state government," and "would be inconsistent with the mission of public television and could alter programming decisions."

The upshot of the evidence—starting with the FCC study, buttressed during congressional hearings, and reinforced by additional evidence before the district court—is that the government has a substantial interest in imposing advertising restrictions in order to preserve the essence of public broadcast programming.

## 2.  Narrow Tailoring

With this substantial interest in mind, the next question in our intermediate scrutiny analysis is whether the law is "narrowly tailored to further [that] substantial government interest." *League of Women Voters*, 468 U.S. at 380. Unlike strict scrutiny, intermediate scrutiny does not require that the means chosen by Congress be the least restrictive. *See Turner I*, 512 U.S. at 662; *United Brotherhood of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 968 (9th Cir. 2008). As the Supreme Court succinctly noted in a commercial speech case, narrow tailoring requires "a 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Bd. of Tr. of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989) (citation omitted).

Understanding the contrast between this case and the ban on editorialization in *League of Women Voters* is a useful starting point in the narrow tailoring analysis. *See* 468 U.S. at 393. That ban was patently overinclusive because it "include[d] within its grip a potentially infinite variety of speech" that was not related to the government's interests in protecting NCE stations from "being coerced . . . into becoming vehicles for government propagandizing or the objects of governmental influence." *Id.* at 393, 396. The restriction was also patently underinclusive. *Id.* at 396. Because the stations remained "fully able to broadcast

controversial views so long as such views [were] not labeled as [their] own," the ban did not effectively "reduce the risk of government retaliation and interference." *Id.* at 384–85. There was also evidence that some supporters of the bill were less concerned with the risk of government control of NCE stations than they were with protecting themselves from critical speech. *Id.* at 387 n.18 (quoting the provision's chief sponsor, who explained that some representatives "have very strong feelings because they have been editorialized against"). Finally, the government's interest in ensuring that audiences would not presume that broadcasters' editorials reflected official government views could have been easily satisfied by a less restrictive regulation requiring NCE stations to broadcast a disclaimer when they editorialized. *Id.* at 395. In short, there was very little fit between the ban and its stated purposes.

In contrast, § 399b's restrictions are narrowly tailored to the harms Congress sought to prevent. Having documented the link between advertising and programming, Congress reaffirmed the long-standing ban on advertising on NCE stations, but in a more targeted manner. In place of the prior absolute ban on promotional content, which swept within its reach a wide range of speech that did not pose a significant risk to public programming, Congress enacted targeted restrictions that leave untouched speech that does not undermine the goals of the statute. The restrictions leave broadcasters free to air enhanced underwriting, which both the FCC and Congress determined did not pose the same risk to programming as advertisements. Broadcasters may air any promotional content for which consideration was not received. Finally, the statute permits non-profit advertisements. As to this latter category, the government offered evidence that non-profit advertisements, which are

few in number and perceived by the public as consistent with the mission of public broadcasting, do not pose the same threat as other forms of advertising.

Section 399b's prohibitions are specifically targeted at the real threat—the influence of paid advertising dollars. Congress identified significant special interests that pump money into advertising, setting out three subsets of advertisers—typical for-profit businesses, political candidates, and advocacy groups. The term "advertisement" is defined by reference to these three subsets, which taken together have a single effect: to prevent the commercialization of public broadcasting by prohibiting nearly all advertising. Although the dissent proffers unsupported distinctions between political or issue advertisements and commercial advertisements they are not germane to the overall threat that Congress targeted: commercialization through advertising.

Unlike the ban on editorialization, which was underinclusive to the point of ineffectiveness, § 399b effectively "insulate[s] public broadcasting from special interest influences—political, commercial, or any other kind." 127 Cong. Rec. 13145 (1981). More than thirty years since § 399b was enacted, the continuing differences between public broadcasting and commercial broadcasting are a testament to the statute's success in promoting Congress's purpose. The government provided expert evidence that the "present system of financing public television is effective"—that it "improves diversity of programming" while "avoiding problems associated with advertisements." Minority TV's unsupported assertion that "399b's attempt to prevent the 'buying' of influence cannot possibly be effective" because "groups, entities, and individuals" can still

"attempt to 'buy' influence" by making donations is not persuasive. Not only is there no evidence that donations affect programming; there is a huge difference between a donation and targeted advertising.

The dissent acknowledges the evidence before Congress and the district court, but offers its own theories of how to protect public broadcasting. Contrasting the actual evidence and the dissent's proposals illustrates the difference between the strict scrutiny standard that the dissent hoped we would apply and the intermediate scrutiny standard that we are bound to apply. We do not demand mathematical precision from Congress; rather, we demand a "fit" between the ends and the chosen means. *Fox*, 492 U.S. at 480. The evidence in this case easily demonstrates a fit between section 399(b) and the substantial interest in protecting the essence of public broadcasting. Therefore, section 399(b) survives intermediate scrutiny on this prong of the analysis under *League of Women Voters*.

### a. Overinclusiveness: Challenge to Issue and Political Advertising Restrictions

Minority TV essentially lets pass § 399b's restriction on for-profit goods and service advertising and focuses its attack on the political and issue advertising restrictions. This attack rests on a distinction without a difference. Congress was trying to prevent the commercialization of public broadcasting itself, not simply advertisements by commercial businesses.

Minority TV mistakenly attempts to equate congressional focus on commercialization with for-profit businesses; but this reading is at odds with congressional intent. Congress

determined that the "insulation of program control and content from the influence of special interests—be they commercial, political or religious"—was necessary. *See* H.R. Rep. No. 97-82, at 16 (1981). The government's evidence regarding the enormous sums spent on political advertising confirms Congress's prediction that, like advertising by for-profit entities, political advertising dollars have the power to distort programming decisions. In 2008 alone, political advertisers spent $2.2 billion. As the campaign season gets longer and longer, commercial television viewers are bombarded with political and issue advertising. Prohibiting only goods and services advertising and allowing issue and political advertising would have shifted incentives and left a gaping hole in § 399b's protections.

We recognize the special place political speech has in our First Amendment jurisprudence. *Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("Political speech, of course, is 'at the core of what the First Amendment is designed to protect.'") (citation omitted). But there is no evidence that Congress was targeting political speech, critical speech or particular viewpoints as opposed to the programming influence exerted by advertising dollars. *Cf. League of Women Voters*, 468 U.S. at 387 n.18 (noting that some supporters of the ban on editorialization "appear to have been more concerned with preventing the possibility that these stations would criticize Government officials" than with the risk of undue government influence).

Each form of prohibited advertising poses a similar threat. Whether selling financial services, a state senator, or a voter initiative, advertisers seek the largest possible audience. *See* H. Hgs. 149 ("The purpose of advertising is simply to sell—a product or an image. Selling makes its own demands.")

(Larry Sapadin, Executive Director, Association of Independent Video & Filmmakers, Inc.). Advertisers also seek programming that is consistent—or at least not contrary to—their messages and values, or the values of their customers or constituencies. *See* Yoo, Christopher S., *Architectural Censorship and the FCC*, Regulation, vol. 28, issue 1 (2005), at 24 ("Anecdotal evidence suggests that some advertisers have discouraged networks from offering programming that addresses controversial issues or that casts their products in an unflattering light. In addition, reliance on advertising support leaves programmers vulnerable to the political biases of advertisers and special interest groups."). Finally, selling programs would essentially convert public broadcasting into commercial broadcasting. *See, e.g.*, H. Hgs. 71 ("If we get public broadcasting into the selling of time, how do we avoid then getting public broadcasting . . . into a very large commitment of their own to figure out what demographics they are touching or what the measurement is going to be able to be of that particular population, and how much X program sells for and how much Y program sells for?") (Sen. Wirth). It strains logic to suggest that advertisers would compete intensely to run ads for a state senator or a voter initiative on guns or taxes during Sesame Street or Mister Rogers. Children are hardly the appropriate target audience.

Minority TV argues that more was needed before Congress could prohibit issue and political advertising. We disagree. Substantial evidence before Congress supported its determination that the selling of airtime to political and issue advertisers, as with for-profit advertisers, would distort programming decisions. As the Court observed in *Turner II* in rejecting the dissent's insistence that Congress was required to have more information before it could enact the

cable must-carry legislation, that level of factfinding "would be an improper burden for courts to impose on the Legislative Branch."  520 U.S. at 213.  "That amount of detail is as unreasonable in the legislative context as it is constitutionally unwarranted." *Id.*  Congress's prophylactic action, based on common sense, congressional understanding of how political advertising works, and record evidence, did not need to await an empirical study to support its predictions. *See Turner I*, 512 U.S. at 665 ("Sound policymaking often requires legislatures to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.").

Congress's determination that all three kinds of advertising posed a significant threat to public programming is supported by substantial evidence, and Minority TV does not point to any evidence indicating that issue and political advertising are less likely to result in commercialization than corporate goods and services advertising.  Its argument as to overinclusiveness doesn't pan out.

### b. Underinclusiveness: Challenge to Permitting Advertising by Non-Profit Entities

Minority TV makes much of the fact that § 399b does not prohibit advertising by non-profit entities.  It frames this as an argument that § 399b favors commercial speech—advertising by non-profits—over non-commercial speech—political and issue advertisements.  Minority TV claims that the statute "clearly inverts the hierarchy of constitutional protections of speech."  There is, however, a documented reason for exempting this tiny slice of advertising from the overall

restrictions—non-profit advertising is a drop in the bucket money wise and this limited advertising has no programmatic impact.

Although the cases that Minority TV relies on for this argument concern newspaper racks and portable signs, the argument itself appears to come straight from the law of billboards. It is true that, with respect to billboards, "an ordinance is invalid if it imposes greater restrictions on noncommercial than on commercial billboards." *Nat'l Adver. Co. v. Orange*, 861 F.2d 246 (9th Cir. 1988). But public broadcasting stations are not billboards, and broadcast regulations are not subject to the formulation for billboards, newspaper racks, or signs. "Each method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949) (Jackson, J., concurring)).

Even if this longstanding distinction were cast aside, Minority TV's reliance on cases such as *Ballen v. Redmond*, 466 F.3d 736 (9th Cir. 2006), and *Cincinnati v. Discovery Network*, 507 U.S. 410 (1993), is misplaced. In *Ballen*, for example, the sign ordinance was ostensibly intended to promote safety and community aesthetics. Instead, the ordinance discriminated on the basis of content and the permitted signs created the same harms as the prohibited ones. This was a classic mismatch between the restriction and its stated purpose. Unlike the statute here, the ordinance in *Ballen* was not "a reasonable fit between the restriction and the goal[.]" 466 F.3d at 744. *Discovery Network* also underscored the same absence of "reasonable fit" because the ordinance was directed to such a "paltry" aspect of the

purported problems posed by newspaper racks.  507 U.S. at 417–18.

To the extent that Minority TV is making an underinclusiveness argument—that § 399b is underinclusive because it does not prohibit goods and services advertising by non-profits—that attack also fails.  *See Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2668 (2011) (explaining that "[r]ules that burden protected expression may not be sustained when the options provided by the State are too narrow to advance legitimate government interests"); *see also Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1238–39 (10th Cir. 2004) ("The underinclusiveness of a commercial speech regulation is relevant only if it renders the regulatory framework so irrational that it fails materially to advance the aims that it was purportedly designed to further.").  The statute in *League of Women Voters* was "patent[ly] . . . underinclusive[]" and "'provide[d] only ineffective or remote support for the government's purpose,'" whereas § 399b has been effective in meeting the government's asserted interest.  468 U.S. at 396 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980)).  Allowing non-profit advertising has not thwarted § 399b's goals.

In promulgating its newly liberalized 1981 regulations, the FCC noted that "[m]any commenting parties were concerned with the proscription" on promoting the sale of products or services as applied to announcements made on behalf of non-profit entities or the station itself.  86 F.C.C. 2d. at 144.  The FCC addressed this concern by limiting the ban to announcements for which consideration was received.  *Id.* at 148–49.  Congress went one step further in narrowly tailoring the legislation, by allowing non-profit advertising for goods and services without regard to whether consideration was received.

Congress's prediction that non-profit advertising would not pose the same risk to public broadcasting as the restricted types of advertising is borne out by the record. Lance Ozier from the WGBH Educational Foundation explained that advertising by non-profit entities "do[es] not present the same danger" to public television as prohibited forms of advertising because (1) "viewers generally have seen messages from [non-profit] entities as being consistent with the public education mission of public television," so advertisements by non-profit entities "do not threaten traditional funding sources" like viewer donations and government grants, and (2) "there is a much smaller set of not-for-profit advertisers than there is of for-profit advertisers." Non-profit advertising sales are so small that they did not even register on the breakdown of public television revenue sources presented by the government. Indeed, there is only a single actual non-profit announcement in the record before us, and it is not one that Minority TV sought to broadcast. Non-profit advertising does not pose the same threat as commercial, political, or issue advertisements in large part because the number of corporate advertisers dwarfs the number of potential non-profit advertisers. In the end, exempting non-profit advertising underscores, rather than undermines, Congress's narrow tailoring.

### c.  No Sufficient Less Restrictive Means

The goals of § 399b cannot "be fully satisfied by less restrictive means that are readily available." 468 U.S. at 395. Section 399b already is a less restrictive means of ensuring diverse, high quality programming on public broadcast stations than either the previous promotional prohibition or any attempt to directly regulate program content rather than

advertising.[8]   The latter approach would not only be less effective, it would open a different can of First Amendment worms.

Minority TV insists that time, place, and manner restrictions could achieve the same goals.  Without any support as to correlation with Congressional goals, Minority TV blithely suggests limiting the number of underwriting announcements or permitting advertising that doesn't interrupt programming and is limited in length.  But that argument runs counter to the evidence.  Lance Ozier concluded that NCE stations would "be forced to change [their] programming substantially . . . even if advertisements did not interrupt programming or if they were limited in length." Ozier explained that, "should public broadcasting be perceived as being 'commercial,'" NCE stations would have a harder time soliciting donations from viewers and might lose funding from federal and state government sources, foundations, and other not-for-profit underwriters.  The stations could also experience increased costs by losing the beneficial treatment they currently receive in negotiating labor contracts and broadcast rights.

Minority TV also ignores the history of the Advertising Demonstration Program, an experiment authorized by the Public Broadcasting Act of 1981 that allowed advertisements on some public broadcast stations subject to the very

---

[8] According to Roger Noll, "the regulatory approach—improving the content of programs by writing content rules—is not as effective as simply removing the commercial incentive by eliminating advertising and subsidizing the right kind of programs."  For example, the poor outcomes of efforts to mandate educational and informational children's programming on commercial stations evidence the weakness of a content regulation approach.

restrictions Minority TV proffers—that the advertisements not interrupt programming and be limited in length. The Temporary Commission on Alternative Financing for Public Telecommunications ("the Commission"), which was charged with overseeing the experiment, concluded that "the benefit that some public broadcasting stations might gain additional revenues from the authorization of limited advertising does not balance the potential risks identified in this report." Among the potential risks identified were those noted by Ozier. For example, representatives of the five major unions involved with program production told the Commission that they "may seek 'commercial' rates and rights agreements from public broadcast stations that air limited advertisements," and copyright-owners' representatives similarly indicated that they might seek higher payments from those stations.[9] Based on the results of the experiment, the Commission recommended that Congress leave § 399b's prohibitions in place. It is rare to have the benefit of a comparison when judging less restrictive means. We cannot ignore experience with alternatives that demonstrates that § 399 is narrowly tailored to accomplishing Congress's goals.[10]

---

[9] The Commission obtained agreements to freeze labor and copyright costs for the course of the experiment with the express assurance that such freezes would not constitute a precedent if limited advertising were later authorized.

[10] We are surprised by the dissent's effort to undermine the Commission's recommendation with selective excerpts from the Commission's report. For example, the dissent picks up on language suggesting a possible increase in revenues. The Commission, however, specifically discounted reliance on data showing any increased revenue. The dissent also highlights opinion polls that "showed an increase in the number of subscribers who reported that they would continue to contribute;" in fact, the actual data reflected "[a] significant decline in

Finally, although Congress may not have considered a pure time, place and manner restriction, as Minority TV claims it should have, it did evaluate less restrictive alternatives.  The House considered an alternative to § 399b that would have allowed institutional advertisements that did not interrupt regular programming and did not exceed thirty seconds in duration.  H. Hgs. 24 (proposed text of H.R. 2774). While some of those who testified before Congress supported allowing institutional advertisements, many opposed it.  *See, e.g.*, H. Hgs. 229 (David Ives, president of WGBH TV in Boston) (stating that allowing logograms "liberalizes our rules without compromising our principles," but that permitting even limited institutional advertisements would "blur the distinction between us and commercial stations"); H. Hgs. 149 (Association of Independent Video and Filmmakers, Inc.) ("Even tasteful, institutional advertising will give rise to programming that will conform to the purposes of corporate image-building . . . .").

## II.  FACIAL VAGUENESS CHALLENGE TO § 399b

Section 399b's prohibition of paid messages intended to "promote" any service, facility, or product of a for-profit entity is not unconstitutionally vague.  A statute need not have "mathematical certainty" to survive a vagueness challenge; instead, it may be marked by "flexibility and reasonable breadth, rather than meticulous specificity."

---

average contribution per subscriber at advertising stations." Moreover, the data showed reduced giving from large contributors.  Likewise, the dissent ignores new costs to public broadcast stations that the Commission identified, including tax increases or complete loss of tax-exempt status that could result without section 399(b).  The dissent's "evidence" does not withstand basic scrutiny.

*Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (citation omitted). Nonetheless, the meaning of the term "promoting" a product or service is fully within "common understanding" and is clear in the vast majority of circumstances. *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001). To the extent it is not, the FCC—to remove uncertainty—provides declaratory rulings to broadcasters who fear they might run afoul of § 399b. 47 C.F.R. § 1.2. This guidance serves to "sufficiently narrow potentially vague or arbitrary interpretations" of the statute. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, *Inc.*, 455 U.S. 489, 504 (1982).

## III.   AS-APPLIED CHALLENGE TO § 399b AND CHALLENGES TO 47 C.F.R. § 73.621(e)

The district court correctly dismissed Minority TV's as-applied challenges to § 399b and its challenges to 47 C.F.R. § 73.621(e). Section 399b was applied to Minority TV only through FCC orders and regulations, including 47 C.F.R. § 73.621(e). Jurisdiction over challenges to FCC orders lies exclusively in the court of appeals; as such, federal district courts lack jurisdiction over appeals of FCC orders. 28 U.S.C. § 2342(1) ("The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or determine the validity of . . . all final orders of the Federal Communications Commission."). *See also United States v. Dunifer*, 219 F.3d 1004, 1007 (9th Cir. 2000) (explaining that district courts lack jurisdiction over any challenge to FCC regulations).

Although the Supreme Court has previously reviewed a First Amendment challenge to an FCC regulation that was initially filed in federal district court, *see Greater New*

*Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173 (1999), the Court in that case did not address—and was not asked to address—whether jurisdiction in the district court was proper.  Courts "are not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio."  *United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952).

**AFFIRMED.**

CALLAHAN, Circuit Judge, concurring and dissenting:

I concur in the majority's opinion only insofar as it upholds 47 U.S.C. § 339(b)'s prohibition against paid advertisements by for-profit entities.

I dissent from the majority's acceptance of § 339(b)'s prohibition of advertisements on issues of public importance or interest and for political candidates.  As explained by the Chief Judge in his dissent, and by Judge Bea in his opinion for the three-judge panel, *Minority Television Project, Inc. v. F.C.C.*, 676 F.3d 869, 885–89 (9th Cir. 2012), these restrictions implicate the First Amendment's core concerns and are not justified on this record even under the intermediate standard set forth in *FCC v. League of Women Voters*, 468 U.S. 363 (1984).  I would hold that these restrictions are unconstitutional.

Chief Judge KOZINSKI, with whom Judge NOONAN joins, dissenting:

The United States stands alone in our commitment to freedom of speech. No other nation—not even freedom-loving countries like Canada, England, Australia, New Zealand and Israel—has protections of free speech and free press like those enshrined in the First Amendment. These aren't dead words on paper written two centuries ago; they live. In many ways, the First Amendment *is* America. We would be a very different nation but for the constant buffeting of our public and private institutions by a maelstrom of words and ideas, "uninhibited, robust, and wide-open." *N.Y. Times* v. *Sullivan*, 376 U.S. 254, 270 (1964).

But the First Amendment isn't self-executing; it depends on the vigilance of judges in scrutinizing the multitude of prohibitions, restrictions, burdens and filters that government—federal, state and local—constantly seeks to impose on speech and the press. The essence of First Amendment vigilance is skepticism, not deference. Governments always have reasons for the things they do and, for the most part, we accept those reasons as valid, even if they're not entirely persuasive. But prohibitions on speech are different. Whether we engage in strict scrutiny, which applies to most forms of speech, or intermediate scrutiny, which my colleagues believe applies here, we don't uphold restrictions on speech if the government's reasons do not, at the very least, make sense.

The majority embraces every justification advanced by the government without the least hesitation or skepticism, and without giving proper weight to the true harms caused by the

speech restrictions in question. The opinion is certainly a fine example of rational basis review, but if intermediate scrutiny is to have any bite, we can't just trot out all of the reasons the government advances in support of the regulation and salute.

The Supreme Court showed us how intermediate scrutiny *should* be done in *FCC* v. *League of Women Voters*, 468 U.S. 363 (1984). There, the Court found restrictions on speech wanting because the government's justifications were speculative and any problems could be remedied by less drastic means. *Id.* at 385–99. The majority here downplays *League of Women Voters* as an obvious case of governmental overreach, but it wasn't so obvious to the four Justices who wrote three separate dissents taking the majority to task for failing to accord the speech restrictions sufficient deference. The majority cites the *League of Women Voters* opinion, but its approach resembles far more the dissents.

That said, it's hard to pinpoint exactly where the majority goes astray. I will note what I consider to be errors, but doubt I can persuade those not already on board. How could I? With a standard as mushy and toothless as intermediate scrutiny, it's hard to *be* clearly wrong. A standard that calls on us to distinguish among shades of gray provides scant protection to speech: The very indeterminacy of the standard enables—nay, encourages—judges to apply their own values. Speech that judges like gets protected, and speech that judges don't like gets the back of the hand. And judges like public radio and television, while pretty much nobody likes commercials. It's hardly a fair fight, which is why I believe it's time to reconsider the applicability of intermediate scrutiny to broadcast restrictions.

The Court plucked broadcast stations out of the mainstream of First Amendment jurisprudence in 1969, when the world of communications looked vastly different. The only way to reach mass audiences in those days was through the broadcast spectrum. And no medium of communication approached the power of radio and television to reach into people's homes with sounds and images. Given the scarcity of the broadcast spectrum and the absence of viable alternative means of communication, the Court may have justifiably believed that it was confronted with a market failure—a bottleneck in the pathways of communication. It may have served the First Amendment to correct that market failure by keeping those pathways accessible to a multitude of views, *Red Lion Broad. Co.* v. *FCC*, 395 U.S. 367 (1969), safe for minors, *FCC* v. *Pacifica Found*, 438 U.S. 726 (1978), and otherwise regulated.

I'm certainly not the first one to note that that rationale—whatever its merits at the time—no longer carries any force. *See, e.g.*, *FCC* v. *Fox Television Stations*, 129 S. Ct. 1800, 1819–22 (2009) (Thomas, J., concurring). It's a fine point whether judges of the inferior courts are bound by Supreme Court decisions that the Court itself hasn't yet bothered to overrule, but whose rationale has been decimated by intervening developments. I was once of the view that only the Supreme Court may perform such operations, and the rest of us must keep applying law we know to be wrong until the Court tells us otherwise. In fact, I once wrote a jeremiad warning my colleagues of the perils of treating a Supreme Court case as overruled, when the Court itself hadn't told us so. In that case, we not only defied a six decades-old Supreme Court precedent, but also dozens of cases in every other regional circuit. *See United States* v. *Gaudin*, 28 F.3d 943 (9th Cir. 1994) (en banc) (Kozinski, J.,

dissenting). And, as I predicted, the Court granted cert. and . . . unanimously affirmed us. *United States* v. *Gaudin*, 515 U.S. 506 (1995). So I guess the lesson is, we must not get ahead of the Supreme Court—unless we're right.

# I

The statute here draws a curious line between permissible and impermissible speech: Advertisements for commercial goods and services are prohibited, and so are those for political candidates and issues. 47 U.S.C. § 399b. But logograms and advertisements for goods sold by non-commercial entities are permitted. *Id.* To determine whether speech falls on the permitted or prohibited side of the line, the regulator (here the FCC) must evaluate what the speech says; it must evaluate speech based only on its content. Moreover, as the majority recognizes, some of the prohibited speech—namely political and issue advertising— implicates the First Amendment's core concern with ensuring an informed electorate. We must therefore be doubly skeptical: first, because the restriction is content-based and, second, because we have traditionally treated some of the prohibited speech with the greatest solicitude.

The majority declares itself satisfied with the evidence supporting these prohibitions and distinctions, but the record is much sparser and far more ambiguous than the majority acknowledges. There is, for starters, almost nothing in the congressional record compiled at the time the legislation was adopted that speaks to the supposed dangers posed by political and issue advertising. Many witnesses testified about their fear that "[c]ommercialization [would] make public television indistinguishable from the new commercial or pay culture cable services." Maj. op. 21 (citing *Hearings*

*before the Subcomm. on Telecomms., Consumer Protection, and Finance of the H. Comm. on Energy and Commerce on H.R. 3238 and H.R. 2774*, 97th Cong. 149 (1981) (Larry Sapadin, Executive Director, Association of Independent Video & Filmmakers, Inc.) [hereinafter H. Hgs.]); *see also* H. Hgs. at 323 (Walda W. Roseman, NPR).    But commercialization, as that term is commonly understood, deals with commerce; it says nothing at all about advertising for political candidates or on issues of public interest.

The majority also points to a few comments suggesting that Congress feared the influence of political interests. Jack Golodner, of the AFL-CIO, for example, advocated that public broadcasting be "insulated from political, corporate, and, for that matter, labor influence." *See id.* at 112. Congressman Gonzales similarly emphasized the need to "insulate public broadcasting from special interest influences—political, commercial, or any other kind." 127 Cong. Rec. 13145 (1981).  But such general concerns about insulating public television from a variety of influences say nothing about advertising.  No one explained, much less provided evidence, how allowing stations to accept paid advertising from politicians would make them subject to influence by those politicians.  No one said a word about influence by organizations that sponsor issue ads.  Stray comments, unsupported by facts, may be enough to support legislation under the all-forgiving rational basis test, but intermediate scrutiny surely calls for more.

There are other lacunae in the legislative record.  No one explains why political and issue ads are dangerous, if advertising for non-commercial entities (including product ads) isn't.  If legislators feared influence, why didn't they worry about stations falling under the sway of

non-commercial entities? The list of non-commercial entities is vast. Many are poorly funded and non-controversial (such as some museums and theater groups), but others are quite wealthy and influential, including advocacy groups, churches, foundations, think tanks and fraternal organizations. The legislation forbids non-profit organizations from advertising about matters of public concern or candidates for public office. But nothing prevents them from advertising themselves and the services they offer, and thereby presumably influencing the programming of public broadcast stations. If there are reasons why influence by the Westboro Baptist Church, Heritage Foundation, Planned Parenthood, National Rifle Association, Middle East Research Institute, Family Research Council, Media Matters for America and AARP poses less of a threat than influence by entities commenting on issues of public importance or candidates for public office, they are nowhere to be found in the legislative record.

Even if we look at the evidence developed after the legislation was passed—some of it decades later—there isn't much to support the ban on political and issue ads. The majority cites a magazine article stating that in 2008, $2.2 billion was spent on political advertising. Maj. op. 29. So what? Where's the evidence that public broadcasters would suffer adverse consequences if they were allowed to run such ads? We can't assume that political campaign ads will have the same adverse effects attributed to commercial ads (more on this later). Political ads are inherently more transitory and episodic—centering on a particular campaign season, ballot issue or candidate—so it's far from clear that they would present the same capture problem attributed to ads for commercial products, whose producers are in the market for the long haul. Nobody bothers to explain the connection, and

yet the majority sees no problem. This is hardly rational basis review, much less intermediate scrutiny.

And the new evidence says nothing at all about issue ads. Neither of the expert affidavits (such as they are) even mentions them. There is no magazine article suggesting there are billions of dollars in issue ads gearing up to invade the public airwaves. No one suggests that sponsors of issue ads are waiting voraciously in the wings, yearning to pressure public broadcast stations into changing their programming. Not a word. Nor is there a hint of a suggestion that issue ads are out of keeping with the high-brow character of public television. And, of course there can't be, because issue ads are about ideas. Where's the beef?

Issue ads can be quite important from a First Amendment perspective. Aside from generating revenue, which public televison and radio stations can use to produce more and better programming, issue ads can help educate the public about some of the most significant questions of the day: whether to take military action against foreign nations; whether private individuals should have the right to carry concealed weapons; whether minors are entitled to undergo certain medical procedures without their parents' consent; whether we should have capital punishment, and for what crimes; whether undocumented aliens should be given a path to citizenship; how the tax burden should be allocated; whether same-sex couples should be allowed to marry; whether the government should be reading our e-mails or listening to our phone calls . . . . The list is endless. How exactly would public broadcasting as we know it be harmed by allowing a limited number of paid issue ads that don't interrupt programming? My colleagues give the issue ban a pass, based entirely on the momentum supposedly created by

the ban on commercial advertising.  This isn't intermediate scrutiny; it's zero scrutiny.

Which brings us to the one debatable issue—the ban on advertisements for commercial products and services, which was at the center of congressional concern when the 1981 Act was passed.  There was, indeed, much hand-wringing about the dangers of commercialization, most of which the majority references in its opinion.  But there's nothing that one might call *evidence*.  The legislation was designed to deal with the problem of drastically diminished federal funding for public broadcast stations, and the need for those stations to raise money from other sources.  Congress considered several fund-raising possibilities, among them various flavors of commercial advertising, including logograms, institutional advertisements (promoting companies rather than specific products) and commercial advertising.  It's fair to say that none of the witnesses thought commercial advertising was a good idea, and most thought it would significantly harm public broadcasting.

Their concerns can be divided into roughly 4 categories: (1) that adding commercial advertising would force changes in program format and cause public broadcasting to lose its distinctive character; (2) that broadcasters' ability to raise money commercially would cause subscribers and other non-commercial sources of funding to withdraw support; (3) that the need to raise revenue through commercial advertising would necessitate changes in programming content, so as to attract larger audiences, leaving no airtime to serve audiences with less popular tastes; and (4) that there would be an increase in various costs, ranging from increased labor costs to the payment of additional royalties for copyrighted materials to loss of various statutory benefits.    In the

aggregate, the witnesses fretted, allowing commercial advertising would dramatically change the character of public broadcasting, defeating its mission of serving audiences not served by commercial stations.

These are certainly weighty concerns, but what's remarkable about the testimony presented to Congress is that they are nothing *but* concerns. The legislative record contains no documentation or evidence; there are no studies, no surveys, no academic analyses—nothing even as meaty as the rather anemic expert reports introduced by the government in our case. Sure, a lot of people worried that commercial advertising would wreck public broadcasting, but people worry about a lot of things that never come to pass. *See, e.g.*, Peter Gwynne, *The Cooling World*, Newsweek, April 28, 1975, at 64. Where's the proof, or even the rigorous analysis, showing that the matters worried about were likely to occur? It's certainly not in the legislative record.

I know it's difficult to prove with certainty what the future will bring. *See, e.g.*, *Turner Broad. Sys.* v. *FCC* (*Turner I*), 512 U.S. 622, 665 (1994). Nevertheless, if we're conducting some level of heightened scrutiny, not merely rational basis review, we should insist on something more than a bunch of talking heads bloviating about their angst. We should expect, for example, a study of how public broadcast stations actually operate, how they differ in their governance and structure from commercial stations and whether those differences have any bearing on how they are likely to respond if they were allowed to raise money through commercial advertising. Or, witnesses might have presented historical examples shedding light on the likelihood of future behavior, or the experience of broadcast stations in other countries. But there's nothing like that; we're left to take on

faith that the witnesses' fears are justified. Such faith isn't consistent with the heightened scrutiny courts are supposed to give legislation that abridges the freedom of speech.

In fact, there was a great deal that Congress could have considered before resorting to such strict speech restrictions—things we may not ignore in judging the legislation under heightened scrutiny. We must consider whether the speculation about the dangers of commercial advertising makes sense in light of all the known circumstances, just as the Court did in *League of Women Voters*, 468 U.S. at 385–99. The concerns expressed by the various witnesses about the dangers of commercial advertising boiled down to the fear that it would change public broadcasting into a more commercial enterprise, which would disserve the segment of the public not being adequately served by commercial broadcasting.

Does this make sense? Commercial broadcasters operate the way they do precisely because they're commercial entities, whose purpose is to make profits for their shareholders. Managers of commercial broadcast stations and networks thus generally measure their success based on the broad popularity of their shows and the revenue they generate as a result of commercials and subscriptions. We call this capitalism, and we're perfectly content to have the laws of supply and demand control the behavior of commercial entities.

But we don't observe non-commercial entities operating by the same rules: Museums, charities, churches, universities, hospitals, theater companies, musical ensembles and a large variety of other organizations operate on a non-profit basis, even as similar institutions (e.g., hospitals,

museums, universities, theaters) operate side-by-side with them on a commercial basis.  The lure of profit doesn't cause charitable institutions to abandon their missions and reinvent themselves as commercial entities:  The Red Cross doesn't go into the business of selling blood or charging for rescue missions because there's a quick buck in it; the Met doesn't swap programs with the Grand Ole Opry because it thinks it can make more money playing country music; and food banks don't start charging prices that match those of the supermarket across the street.

We understand perfectly well why this is so.  Charitable and civic organizations have charters and other organizational constraints that tie them to their mission; they have a variety of governmental regulations and incentives that keep them from straying into the commercial arena; they have managers and staff who are dedicated to the organization's core purpose; and they have boards of directors who supervise them to ensure they stick to it.  Just as important is what they don't have: shareholders who demand a return on their investments.  Charitable and civic organizations intrinsically operate by different rules than commercial entities, and it would never occur to us to pass laws prohibiting the Los Angeles County Museum of Art from selling automobiles and dishwashers, even though the sale of such items might well be profitable and allow the museum to acquire more and better art.

It thus seems wholly irrational to make undocumented claims about the likely behavior of public broadcast stations, were they allowed to air advertisements, without first considering the ways in which they differ from commercial entities.  And the differences are huge.  To begin with, public broadcasters must, by law, operate as non-profit entities.

47 C.F.R. § 73.621. They must be owned by "a public agency or nonprofit private foundation, corporation, or association," or by a municipality. 47 U.S.C. § 397(6). Any station that *isn't* owned or operated by a state, political subdivision of a state or a public agency must have a community advisory board. 47 U.S.C. § 396(k)(8)(A). In fact, universities operate most public radio stations, while non-profit community organizations and state government agencies operate most public television stations. *See* Corporation for Public Broadcasting, *Who Operates the Stations?*, http://www.cpb.org/aboutpb/faq/operates.html.

Federal funding for public broadcasting stations is also conditioned on their maintaining programming that is consistent with the goals of the statute. Federal funds are distributed by the Corporation for Public Broadcasting, which may make grants "for production of public television or radio programs by independent producers and production entities and public telecommunications entities, producers of national children's educational programming, and producers of programs addressing the needs and interests of minorities, and for acquisition of such programs by public telecommunications entities." 47 U.S.C. § 396(k)(3)(B)(i).

Finally, licenses for public broadcast stations aren't handed out on a first-come, first-served basis. In deciding whether to grant an application for a license, the FCC favors: (1) "local applicants . . . who have been local continuously for no fewer than two years"; (2) applicants with "no attributable interests . . . . in any other broadcast station"; (3) public or private entities "with authority over a minimum of 50 accredited full-time elementary and/or secondary schools within a single state"; (4) accredited public or private institutions of higher learning "with a minimum of five full

time campuses within a single state"; and (5) organizations that will "regularly provide programming for and in coordination with [statewide educational] entit[ies]" for use in schools' curricula. 47 C.F.R. § 73.7003. Further, to receive a license, the potential station owner must show that the proposed station will "be used primarily to serve the educational needs of the community; for the advancement of educational programs; and to furnish a nonprofit and noncommercial television broadcast service." 47 C.F.R. § 73.621.

None of those who presented "evidence"—better characterized as Chicken Littleisms—about the calamitous effects of allowing commercial (and political and issue) advertising on public broadcasting took the slightest account of these structural constraints. They all predicted that the lure of advertising dollars would turn public broadcasters into commercial broadcasters. But is it rational to believe that public broadcast stations operated by municipalities, universities and non-profit foundations would risk losing federal funding (and perhaps their FCC licenses) by abandoning their traditional viewership in order to compete with commercial stations for advertising dollars? This strikes me as about as likely as the Smithsonian turning itself into Busch Gardens because it decides that roller coaster rides are more popular than mastodon skeletons.

Still and all, had Congress been presented with evidence that public broadcast stations could be diverted from their mission by the lure of lucre, despite the multitude of structural obstacles—had anyone even mentioned this as a consideration—I might feel constrained to defer to the congressional judgment. But no one paid any attention to the obvious differences between non-profit and commercial

entities, and how they respond to market incentives—even though there is a well-developed branch of economics that deals with precisely this subject.  *See, e.g.*, Burton A. Weisbrod, The Nonprofit Economy (1988); Susan Rose-Ackerman, *Altruism, Nonprofits, and Economic Theory*, 34 J. Econ. Lit. 701 (1996); Joseph P. Newhouse, *Toward a Theory of Nonprofit Institutions: An Economic Model of a Hospital*, 60 Am. Econ. Rev. 64 (1970).

What's more, we know for a fact that some of the witnesses who testified before Congress in 1981 were wrong. Three of the witnesses, each of whom was worried sick about the potentially catastrophic effects of commercialization on public broadcast stations, also made dire predictions about the pernicious use of logograms. Oy vey! Congress nevertheless adopted that provision, and logograms have been in use in public broadcasting for over a quarter of a century.  And, know what?    The Cassandras were wrong; public broadcasting as we know and love it has survived just fine—perhaps a tad better, as underwriting, including logograms, generates much-needed revenue for public broadcasting.    *See* NPR, *Public Radio Finances*, http://www.npr.org/about-npr/178660742/public-radio-finances.

Congress knew that predictions about how commercial advertising would affect public broadcast stations were speculative.    It therefore sought to develop empirical evidence by authorizing an experiment that would allow public broadcasters to air commercial advertising and expanded underwriting credits. A temporary commission was established to study the project and report back to Congress. The majority alludes to this study in its opinion, claiming that

it supports its position, Maj. op. 35–36, but I read the study very differently.

While written in cautious and somewhat tentative terms, the report contained a number of findings and conclusions that severely undermine the doomsday predictions made by witnesses before Congress and accepted as Gospel Truth by the majority today. Specifically, the Commission found as follows:

- "Limited advertising and expanded underwriting credits both generated revenues in excess of reported expenses." Such revenues "equaled about 8.1 percent of the stations' total net income."

- "In several cases, advertising revenues permitted stations to acquire specific programs that they otherwise could not have afforded to purchase. . . . The demonstration program did . . . suggest that (at least where advertising or expanded underwriting revenue is only one source among many) no movement toward programming changes resulted."

- "[W]hile most subscribers and regular viewers reported initially that they would watch less public television if advertisements were present, the second wave of the survey showed no differences in the amount of time these groups reported watching."

- "Although a first wave response suggested that 20 to 40 percent of public television subscribers

might reduce their contributions, the second wave of the opinion poll showed no significant differences in the overall amount of giving reported. Additionally, the poll showed an increase in the number of subscribers who reported that they would continue to contribute to public television."

- "Analysis of subscription revenues at participating stations showed . . . [a]n increase in total number of subscribers and contributors at all stations compared with the previous year; [n]o significant differences in total number of subscribers or total contributions compared to the control group [stations that did not carry advertising]; [a] significant decline in average contribution per subscriber at advertising stations compared to the control group [which] suggests that carriage of limited advertising may have affected giving by large contributors. The decline, however, also could reflect an influx of new subscribers contributing smaller amounts to the stations involved."

It is true, as the majority notes, that the Temporary Commission recommended maintaining the advertising ban, despite these positive findings. Instead of raising revenue through advertising, the Commission recommended enhanced federal funding for public broadcasting—at least the majority did. For this, they were taken to task by the Minority Report, authored by the National Telecommunications and Information Administration, an executive agency within the Department of Commerce. The minority decried the fact that "[t]he majority report . . . does not fully and fairly reflect the

overwhelmingly positive results of the advertising demonstration experiment itself. . . . The majority, in short, seems to have rejected the Congressional directive that we come up with some new lyrics and appears content instead simply to sing what by now is a very familiar song."  It's a song that echoes loud and clear in today's majority opinion, three decades later.  Pointing out that "the public's money is the easiest of all money to spend—because it doesn't seem to belong to anyone," the minority chastised the majority for "continuation of the 'cargo cult' approach all have seen before."  Ditto.

Here is how the Minority Report summarized the results of the demonstration program:  "The evidence produced by the advertising demonstration program is almost completely positive and affirmative.  In no instance did the findings indicate any significant adverse consequences with respect to these matters."  The demonstration program "confirmed the view that people watch and support public television because they like and enjoy the programming, not just because it is 'commercial free.'"  The Commission's polling data, for example, revealed that "no significant audiences were in fact alienated," and that stations were able to generate significant revenues.  Although the minority conceded that there were risks to allowing public broadcasters to air paid advertisements, because of the significance of the potential gains, it concluded that "the sounder course for the Temporary Commission would have been to place maximum reliance on informed licensee discretion, and minimum weight on the utility of Washington-imposed constraints."

The significance of the demonstration program can't be overstated:  It is the *only* evidence in the record about the real-life consequences of allowing public broadcast stations

to run commercial advertisements. And the experience is overwhelmingly positive. The demonstration program points to yet another gap in the majority's reasoning—the failure to appreciate or accord any weight to the serious adverse free speech consequences of the advertising ban. The record suggests three:

First, as the demonstration program illustrates, stations that receive paid advertising revenue can acquire or produce programs that they could not otherwise afford. Thus, the loss of advertising revenue can't be dismissed as simply a loss of money; it is, in fact, a loss of speech. We know for a fact (from the demonstration program) that there are stations wishing to run content that is consistent with their educational and civic mission but can't afford to do so. Advertising revenue would allow public broadcast stations to acquire content that will serve their audiences. Additional revenue would also enable stations to produce local content, which is one of the identified goals of public broadcasting, rather than relying on content produced nationally or abroad.

Second, an infusion of additional non-governmental revenue would help public broadcast stations gain independence from the federal government. The record before Congress, and the record in our case, makes it clear beyond dispute that public broadcast stations are desperately dependent on federal subsidies. Can broadcasters that are so dependent on one source of revenue be truly free to speak in ways that are critical of that source? Would public broadcasters feel free to run a program exposing corruption by, say, the chairman of the relevant appropriations committee? My guess is that any station wishing to produce such a program would be dissuaded from doing so. Washington is a small town with a long memory, and no one

wants to get into a grudge match with the goose that lays golden eggs. The only *true* independence, the only *truly* free speech, comes from having a multitude of funding sources, so that none is so crucial that it can't be dispensed with. Deriving a portion of revenue from commercial advertising, along with other sources, can help secure that independence.

Third, advertisements are speech. Viewers often see commercials as no more than annoying interruptions, but the Supreme Court has recognized that advertisements often carry important, sometimes vital, information. *See, e.g.*, *Bates* v. *State Bar of Arizona*, 433 U.S. 350 (1977) (lawyer advertising); *Virginia State Bd. of Pharmacy.* v. *Virginia Citizens Consumer Council*, 425 U.S. 748 (1976) (prescription drug prices); *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476 (1995) (beer labels). Advertisements can be for annoying, useless or decadent products, but they can also encourage people to get breast exams, http://goo.gl/MM6sV9; join the peace corps, http://goo.gl/bfBmiy; get a smoke alarm, http://goo.gl/wChmN0; prevent forest fires, http://goo.gl/HrCxQG; vote, http://goo.gl/do9TCc, etc., etc. Excluding advertising from public broadcasting deprives viewers of the opportunity to obtain such important information.

The statute's ban on issue advertising (for which, remember, no one gives any justification at all, *see* p. 46 *supra*) is particularly troubling, as it deprives public broadcast audiences of precisely the type of information we expect an informed public to have: how to vote on issues of public importance, http://goo.gl/6CRk3J, http://goo.gl/XLrL9A, http://goo.gl/TL6BQU; the state of public health, http://goo.gl/PXI7am; and the performance and funding of our public schools, http://goo.gl/1BRQJu.

Campaign ads can make or break presidential elections, *see, e.g.*, http://goo.gl/6oGrfy, http://goo.gl/fnFbkh; http://goo.gl/v0Ju.   Can we say that there is really a substantial—or even a rational—justification for precluding public broadcast audiences from being educated on issues of public importance?  Is it consistent with the principles of an informed electorate to deprive those who watch public television and listen to public radio of an important source of information?

I understand the concern about turning public broadcasting into something that is quite different from what it is today.   But why aren't the structural constraints, discussed above, sufficient to prevent this?  And, if we fear they're not, there are many intermediate restraints, far short of a complete prohibition.  The Temporary Commission suggested limiting the duration and placement of advertisements, and ensuring diversity of funding (perhaps by placing a limit on the percentage of revenue any station could derive from any single source).  Surely, anything is better from a free speech perspective than an outright and total ban, yet Congress seems to have given this possibility no consideration.  Nor does the majority.

I add only a few words about the two expert declarations presented by the defendant in the district court; they deserve no more.  Assuming that it's possible to supplement the legislative record decades after the legislation is passed—which to my mind is still an open question, *see Turner I*, 512 U.S. at 671–74 (Stevens, J., concurring)—these experts add nothing to the debate.  The Ozier declaration parrots the worries expressed by the witnesses before Congress.  He predicts that alternative sources of funding would dry up, that stations would yield to pressure from

advertisers to change their programming, that foundations would withdraw their support and that various concessions now enjoyed by public television would be jeopardized. Ozier provides no new facts, just the same lame predictions previously made by others—and largely refuted by the experiment conducted by the Temporary Commission following the passage of the 1981 legislation.

The Noll affidavit does add some new matter, mostly irrelevant. For example, Noll comments adversely on the "advertising of nutritionally undesirable food and . . . the inclusion of violent content" in commercial stations, and reports that "[r]esearch has shown that violent program content causes antisocial behavior among children and food advertising to children promotes an unhealthy diet that causes obesity." What this has to do with the matter under consideration is unclear; it seems at times like Professor Noll prepared his declaration for another client and then adapted it to this case.

In the parts of the declaration that do bear on our case, he pretty much embraces the cargo cult attitude alluded to by the Minority Report of the Temporary Commission, calling for "replac[ing] advertising with government subsidies as the main source of revenues." For this you need a Ph.D.?

Noll also concludes, without much support or analysis, that public broadcast stations would have to change the nature of their programming to generate significant revenue. This conclusion is flatly contradicted by the experiment conducted by the Temporary Commission, which found that stations could gain substantial revenue without changing their content. *See* p. 54–55 *supra*. Noll doesn't mention the Temporary Commission's Report, preferring to rely on his own intuition

rather than inconvenient real-world evidence. Nor does Noll discuss, or even acknowledge, the structural constraints that would likely prevent public broadcast stations from reinventing themselves as commercial stations. I might not go so far as to say the Noll report is irrational, but it certainly doesn't carry the kind of heft—in light of all the other available evidence—that the Supreme Court's analysis in *League of Women Voters* demands.

In sum, the evidence presented by the government in support of these speech restrictions simply doesn't pass muster under any kind of serious scrutiny—the kind of scrutiny we are required to apply when dealing with restrictions on speech. Even if intermediate scrutiny applies—and I doubt that it does, *see* pp. 61–64 *infra*—there is simply not enough there to satisfy a skeptical mind that the reasons advanced are rational, let alone substantial.

## II

Because "[t]he text of the First Amendment makes no distinctions among print, broadcast, and cable media," *Denver Area Educ. Telecomms. Consortium, Inc.* v. *FCC*, 518 U.S. 727, 812 (1996) (Thomas, J., concurring in the judgment in part), *Red Lion* and *Pacifica* represent a jarring departure from our traditional First Amendment jurisprudence. As Justice Thomas explained in his lucid concurrence in *Fox Television*, "*Red Lion* and *Pacifica* were unconvincing when they were issued, and the passage of time has only increased doubt regarding their continued validity." 129 S. Ct. at 1820. Justice Thomas's words echo the views of Chief Judge Emeritus Harry Edwards in *Action for Children's Television* v. *FCC*, 58 F.3d 654, 673 (D.C. Cir. 1995) (en banc) (Edwards, J., dissenting): "There is no

justification for this apparent dichotomy in First Amendment jurisprudence.  Whatever the merits of *Pacifica* when it was issued[,] . . . it makes no sense now."

Today, *Red Lion* looks even more quaintly archaic than at the time Judge Edwards and Justice Thomas made their observations.  To start, the broadcast spectrum has vastly expanded, due in part to advances in technology, including the "switch from analog to digital transmission, which . . . allow[s] the FCC to 'stack broadcast channels right beside one another along the spectrum.'" *Fox Television*, 129 S. Ct. at 1821 (Thomas, J., concurring) (quoting *Consumer Elecs. Ass'n* v. *FCC*, 347 F.3d 291, 294 (D.C. Cir. 2003)).  And "traditional broadcast television and radio are no longer the 'uniquely pervasive' media forms they once were.  For most consumers, traditional broadcast media programming is now bundled with cable or satellite services." *Id.* at 1822.  This trend has continued and accelerated, with the delivery of much content by way of cellular networks and the internet. *See, e.g.*, Jim Edwards, *People Now Spend More Time Watching Their Phones than Watching TV*, Business Insider (Aug. 15, 2012), http://goo.gl/jtrVNk; AJ Marechal, *CW Offers 'Husbands,' More Web Fare from Digital Studio*, Variety.com (Mar. 27, 2013), http://goo.gl/Cww32h; Maura McGowan, *Original Series Help Netflix Turn a Tidy Profit*, Adweek (Apr. 23, 2013), http://goo.gl/9oy0gb; *Procon.org and Pivot.tv Join Forces on Critical Thinking Campaign*, Procon.org (Sept. 13, 2013), http://goo.gl/ibGN1t; Jon Robinson, *New 'Madden' Includes NFL Sunday Ticket*, ESPN Playbook (May 17, 2013), http://goo.gl/gKJRVZ; Alex Stedman, *Disney Invites Kids To Bring iPads to Theaters for 'The Little Mermaid' Re-Release*, Variety.com (Sept. 11, 2013), http://goo.gl/YjEfUw; Esther Zuckerman, *Netflix Has Done It Again: 'Orange Is the New Black' Has 'Astounded'*

*the Critics*, The Atlantic Wire (July 2, 2013), http://goo.gl/mML64G.

For reasons explained at length above, I don't think the standard of review matters very much to the outcome in this case; the restrictions on advertising by public broadcast stations fail any standard of review more rigorous than a straight-face test. But under an intermediate standard of review, the result is highly unpredictable, as judges of intelligence and good faith can view the situation very differently. This isn't because judges have failed; the standard itself promotes uncertainty. Because there are no absolutes, judges are left to exercise their judgment based on their personal experiences and predilections.

"Liberty finds no refuge in a jurisprudence of doubt." *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 844 (1992). Nowhere is this truer than in the case of speech, which is especially vulnerable to uncertainties in the law. This is why we have special doctrines applicable to speech only. For example, we allow those whose rights haven't been violated to bring suit, and we'll strike down a law, even if it has some constitutional application, if it's substantially overbroad. *See, e.g.*, *Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973); *Dombrowski* v. *Pfister*, 380 U.S. 479 (1965); *see also N.Y. Times* v. *Sullivan*, 376 U.S. 254, 272 (1964) (freedom of speech requires "breathing space" (internal quotation marks omitted)). It is our constitutional duty to make the law of free speech clear and predictable.

To the extent *Red Lion* was justified by the state of technology at the time it was written, it's certainly not justified by the state of technology today. The bottlenecks and monopolies that existed in the field of mass

communications when *Red Lion* was decided no longer exist. It's one of the oldest maxims of the common law that once the reason for a rule ceases, the rule itself disappears. It's a maxim the Supreme Court recognizes and expects inferior courts to honor. *See Funk* v. *United States*, 290 U.S. 371, 385–87 (1933). We shouldn't turn a blind eye to the vast technological changes in the field of mass communications that make broadcasting less significant and pervasive every day. We not only have the right, but also the constitutional duty, to brush aside a precedent—venerable though it may be—when its rationale has been hollowed out as if by termites.

*        *        *

I would strike down as unconstitutional the statute and corresponding regulations that prohibit public broadcast stations from carrying commercial, political or issue advertisements. I would reverse the district court and remand with instructions that summary judgment be granted in favor of the plaintiffs. And I would set public television and radio free to pursue its public mission to its full potential. We'd all be better off for it.